MEMORANDUM OF DECISION

GUERNSEY, C.J.
On October 18, 2011 the Plaintiff Dorothy Truss suffered personal injuries, in- *281 eluding an impacted comminuted fracture of the left distal radius and injury to her left leg, when she fell on stairs exiting the YIP Lounge at the Mohegan Sun Casino. Her testimony as to the cause of her fall, that she was expecting a ramp at that point rather than stairs, was both credible and supported by the video surveillance images contained in Defendant’s Exhibit D.[1] At trial, after a view of the premises, the issues that emerged were whether the stairway met the applicable building code and whether the stairs were unsafe.[2]
I
EXPERT TESTIMONY
In support of her contention that the stairs were unsafe, the Plaintiff introduced the testimony of Steven Keedle, a licensed architect. His initial opinion, set forth in a report dated December 24, 2013, was rendered based on a review of photographs rather than an inspection of the scene,[3] and focused on “a false sense of dimensional space” and a “false sense of depth perception” that allegedly tricks the eye into perceiving an upcoming ramp and not a flight of steps. His further contention, that “the lighting conditions, the noise and flashing lights of the casino do not help the situation creating a further sense of disorientation” proved to be inconsistent with the Plaintiffs testimony at trial that the lights of the Casino were not distracting.
After the Defendant’s disclosure of its expert, David Atkinson, and production of his report, Keedle amended his report to include his opinion that the stairs were not in compliance with Section 1014.7 of the 1996 BOCA[4] requirement that “[intermediate handrails are required so that all portions of the required width of the stairs are within thirty inches of a handrail.” Due to the non-parallel placement of the handrails on either side of the steps, Kee-dle contends that of the three steps, the handrails met this requirement with respect to only one.[5] The relevance of this, according to Keedle, is that a railing down the middle of the steps would have alerted the Plaintiff to the fact that these were steps rather than a ramp.
Atkinson, on the other hand, asserts that the Commentary to Section 1014.7 makes it dear that the issue is the “required width,” which is determined by occupancy, and not the total width of the stairs. The “Sachems Lounge Upper Area” occupancy, according to Atkinson’s testimony and Defendant’s Exhibit I, *282 based on square footage, is 235. For purposes of computation of the required width, this was increased to 300 persons and yielded 60 inches of “required” egress width, computed in accordance with Section 1009. Atkinson asserts that the Commentary makes it clear that the stairs in question are fully in compliance, measured with respect to the narrowest, 60 inch stair, and that no intermediate handrail was required. To Keedle’s assertion that a handrail down the middle would be safer, Atkinson pointed out that this would place the stairway in violation of Section 1014.3⅛ requirement that “[a]ll means of egress stairways shall not be less than 44 inches (1118 mm) in width.”[6]
II
PLAINTIFF’S VERISON, VIDEO SURVEILLANCE and VIEW OF THE SCENE
As previously noted, Plaintiffs version of the accident, which the Court finds to be both credible and straightforward, is that she assumed the stairway was a ramp and was not expecting a step. At trial she testified that she had visited the VIP Lounge once previously, and on the day of her fall had initially entered the lounge by ascending a different stairway that also consisted of three steps. This is supported by the view of the scene prior to the taking of testimony, where the entrance to the lounge was shown to be by such a stairway, and by the depiction of the stairway in Defendant’s Exhibit I. Her testimony that she knew that the guardrails were there is consistent with the video surveillance images in Defendant’s Ex-Mbit D and the Court’s view of the scene (the area is accurately depicted in the photograph introduced as Defendant’s Exhibit H-2). The guardrails are very hard to miss.[7]
The view of the scene was especially helpful in assessing the visual image that would have been encountered by the Plaintiff as she approached the stairway. This took place at approximately the same time in the morning as when the accident occurred, and the visual image presented to one leaving the Sachem Lounge as did the Plaintiff is that shown in Exhibit H-2 rather than the photographs accompanying Keedle’s initial report (Plaintiffs Exhibit 4). The marked contrast between the diagonally placed square blue tile and the bright red carpet at the top of the stairway, together with the obvious handrails, clearly draws attention to the fact that a stairway (or possibly a ramp) is there. The area was brightly lit, and Keedle’s assertion that the carpet “appears more like a ramp” is not supported, either by Defendant’s Exhibit H-2 or the actual view of the scene.
Similarly, any reason why the Plaintiff, other than through inadvertence, would expect a ramp rather than a staircase is unclear. She had entered by means of a staircase at the other end of the Lounge, and had clearly seen the guardrails as she approached. The area is well lighted, and the contrast between the diagonally placed blue tile and the rather bright red carpet at the top of the stairway is visually arresting. Atkinson’s report notes that, by his calculation, this stairway was traversed by over 250,000 people in 2013 and 3,250,- *283 000 people over the 13 years of Sachem Lounge’s operation with no reported falls.[8]
Ill
ANALYSIS
The status of the Plaintiff as business invitee is unchallenged, and the Defendant therefore had a duty to keep the premises in a reasonably safe condition. Riccio v. Harbour Village Condominium Association, Inc., 281 Conn. 160, 163, 914 A.2d 529 (2006). In order to establish liability, the Plaintiff has the burden of proving that the conduct of the Defendant fell “below the standard established by law or custom for the protection of others against unreasonable risk of injury or harm,” MTC § 3-245; Archer v. Mohegan Tribal Gaming Authority, 4 G.D.R. 123, 124 (2011).
In attempting to sustain this burden of proof on this issue, the Plaintiff has relied on claimed violations of the 1996 BOCA Code, specifically Keedle’s reading of the requirements of an intermediate handrail in Section 1014.7, an interpretation disputed by Atkinson. A violation of a building code is not negligence per se, but the code can be considered as evidence of the standard of care. New London Federal Savings Bank v. Tucciarone Et Al., 48 Conn.App. 89, 99, 709 A.2d 14 (1998). Although the Court is inclined to agree with Atkinson’s interpretation, a resolution of this issue is not essential to the determination of this case.
“In a personal injury action, ‘[t]o be entitled to damages, the plaintiff must establish a causal connection between his injuries and physical condition which he claims resulted from the accident and this causal connection must rest upon more than surmise.’” Yarasavich v. Mohegan Tribal Gaming Authority, 4 G.D.R. 66, 67 (2010), quoting Vetre v. Keene, 181 Conn. 136, 104-41, 434 A.2d 327 (1980). In this case, the claimed causal connection between the alleged BOCA violation and the Plaintiffs mistaken assumption that the stairway was a ramp is Keedle’s speculation that if there had been an intermediate handrail “then Ms. Truss would have either walked right into the rail post or would have realized the approaching stairway.” Plaintiffs Exhibit H. In light of the video images and the Plaintiffs testimony, it is clear that she was well aware that the guardrails that were there. Whether an additional guardrail would have changed her mistaken belief that the stairway was a ramp is left to speculation, and certainly has not been shown to be more probable than not. As to the reasonableness of her belief, the Connecticut Supreme Court has stated;
We have uniformly held that evidence of the experience of others at a given place is admissible on the question of whether the place was reasonably safe, if it is first established that the circumstances were substantially the same as those under which a plaintiff was injured, and that the use by others was substantially similar to that of the plaintiff.
Zheutlin v. The Sperry and Hutchinson Company, Et Al., 149 Conn. 364, 366-67, 179 A.2d 829 (1962). The use of the stairway by hundreds of thousands (or even millions) of Casino patrons without any report of a fall only emphasizes that the stairway was safe for its intended use and that Plaintiffs mistaken assumption was not in fact reasonable.
“The issue of causation is an essential part of Plaintiffs burden” and where this *284 is left to speculation, judgment for the defendant is appropriate. Yarasamch v. Mohegan Tribal Gaming Authority, 4 G.D.R. 66, 67 (2010).
Judgment shall enter for the Defendant.

. A close examination of the video shows the Plaintiff approaching the stairs with her pocketbook in her left hand, without a cane. Her right heel was placed on the floor at the top of the stairs and when the toe of her right shoe went downward, she was caused to fall violently down the stairs.

. A collateral issue, whether the Plaintiff was using a cane at the time of her fall, is easily resolved by Exhibit D-D which establishes that she was not.

. Mr. Keedle did visit the scene approximated two weeks before trial and accompanied the Court, counsel and Defendant's expert in viewing the scene at the commencement of trial.

. The 1996 Code adopted by the Building Officials and Code Administrators International, Inc. (BOCA) has been adopted by the State of Connecticut as part of the State Building Code, § 29-255-Ic; in 2009 the 2005 Connecticut Building Code, with the 2009 Amendment, was adopted by The Mohegan Tribe as its building code, with the Tribal Building Official taking on the duties of the "Local or Municipal Building Official” in the State Code. MTC § 5-61. The area in question was constructed under the 1996 BOCA Code.

. All measurements considered by both experts are based on a diagram provided by Atkinson in his report.

. Keedle’s response to this, that the proper approach would have been to increase the total width of the stairway (to 88 inches), is puzzling in that it inevitably leads to the conclusion that the "required width” computed under Section 1009 could not be relied upon.

. The video surveillance does contradict Plaintiff's testimony that she was "sure I put my hand on the rail;” she is shown walking near the guardrail to her left side and carrying her purse in her left hand prior to falling.

. The absence of reported falls was confirmed by the testimony of Mary Lou Morrisette, Director of Risk Management for the Mohegan Sun.