# MULLEN AND MAHON, INC. *v.* MOBILMED SUPPORT SERVICES, LLC, ET AL.
## (AC 19734)

Landau, Pellegrino and Callahan, Js.

Argued September 18, 2000—officially released February 27, 2001

*Ronald E. Nettleton,* for the appellants-appellees (defendants).

*Bruce D. Tyler,* for the appellee-appellant (plaintiff).

1

LANDAU, J. The defendants appeal and the plaintiff cross appeals from the judgment rendered in favor of the plaintiff, Mullen & Mahon, Inc., after a trial to the court, in what is essentially an action to collect a debt, sounding in fraud, unjust enrichment and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. On appeal, the defendants, Mobilmed Support Services, LLC (Mobilmed, LLC), John Fantry and William G. Miller, claim, to the best of our understanding,[1] that the trial court improperly concluded that Fantry and Miller were insiders pursuant to General Statutes § 52-552f (b) and that they were personally liable for a corporate debt owed to the plaintiff. On cross appeal, the plaintiff claims that the court improperly concluded that (1) Mobilmed, LLC, was not liable to the plaintiff, and (2) Fantry and Miller did not violate CUTPA. We affirm the judgment of the trial court.

The plaintiff commenced this action in June, 1997 (Mobilmed, LLC, action). Count one of the plaintiff's complaint alleged, inter alia, that the plaintiff, an insurance agent and broker, commenced an action against Mobilmed Support Services, Inc. (Mobilmed, Inc.), on or about December 27, 1996, to recover moneys owed

---

[1] The defendants' brief contains the following statement of issues: (1) "The trial court found the defendants Fantry and Miller insiders and therefore personally liable for the insurance agency's antecedent debt of $26,401.70. While the Court had some doubt as to the exact date of the transfer, there was no doubt that [Mobilmed, Inc.] (the 'debtor') transferred its assets to the [Mobilmed, LLC] and not to Fantry and Miller"; (2) "The transfer [of Mobilmed, Inc.'s assets] was to [Mobilmed, LLC] and not to the defendants as individuals, and not to an insider as required by the statute. 'Insider' in the statute is defined in terms of the debtor's insider and does not address a transferee or what could be called a transferee's 'insider' "; (3) "The assumption of the antecedent debt of Fantry and Miller is not sufficient to find liability on the part of Fantry and Miller as there is no basis in statute for the finding of personal liability"; and (4) "The trial court incorrectly applied and interpreted General Statutes [§ 52-552f] (b)."

to the plaintiff (Mobilmed, Inc., action).[2] It further alleged that the trial court granted the plaintiff's application for an attachment of the assets of Mobilmed, Inc., and the stock of its sole shareholder, Lawrence Cassol, in the amount of $50,000. On December 22, 1997, the court rendered judgment against Mobilmed, Inc., in the amount of $26,401.70 and against Cassol in the amount of $50,305.

The plaintiff also alleged that Fantry appointed Miller president of Mobilmed, Inc., in March, 1996; that Fantry lent Mobilmed, Inc., approximately $95,000 in the fall of 1996; that on or about December 20, 1996, Fantry organized Mobilmed, LLC; and that Fantry and Miller schemed to defraud[3] the plaintiff by permitting Mobilmed, LLC, to occupy the premises of Mobilmed, Inc., to take over the customer list, contracts and business, and to acquire the assets of Mobilmed, Inc., without fair and reasonable compensation. The plaintiff, moreover, alleged that when the foregoing occurred, Fantry and Miller knew that the plaintiff had an attachment on the property of Mobilmed, Inc., in the amount of $50,000. As a result of their actions, the plaintiff claims that Fantry and Miller diminished the value of the stock of Mobilmed, Inc., and the plaintiff's ability to recover on the judgment in the Mobilmed, Inc., action against Cassol and Mobilmed, Inc.

Count two alleged that the defendants were unjustly enriched by the actions of Fantry and Miller, and count

---

[2] There were numerous additional defendants in the Mobilmed, Inc., action.

[3] In its memorandum of decision, the court observed that Practice Book § 10-3 (a) "requires that the statutory section be set forth in the complaint if the claim is grounded on a statute." Although the plaintiff failed to plead a statute in its amended complaint, in its trial brief, the plaintiff cited General Statutes §§ 52-552e, 52-552f and 52-552h. The court, therefore, considered count one to be grounded in the Uniform Fraudulent Transfer Act. See *Goodrich* v. *Diodato*, 48 Conn. App. 436, 443, 710 A.2d 818 (1998). The defendants did not object.

three alleged that the defendants violated CUTPA because their actions were immoral, oppressive and unscrupulous, and caused substantial injury to the plaintiff. The plaintiff sought money damages, punitive damages pursuant to General Statutes § 42-110g (a) and reasonable attorney's fees.

In response to the plaintiff's complaint, the defendants alleged two special defenses. The first special defense alleged that one, two or all of the defendants were creditors of Mobilmed, Inc., and therefore were in the same position as the plaintiff and other creditors. The second special defense alleged that one, two or all of the defendants purchased the assets of Mobilmed, Inc., for a sum in excess of $600,000, which was full and adequate consideration.

Following trial, the court made the following relevant findings of fact and conclusions of law, which are contained in its memorandum of decision. On March 1, 1996, Fantry obtained an option to purchase the stock of Mobilmed, Inc., from Cassol and immediately assumed control of the business. Although Fantry knew that Mobilmed, Inc., was in poor financial condition at that time, he was unaware of the severity of the problem. The assets of Mobilmed, Inc., consisted of several motor vehicles of little value, furniture, fixtures, equipment and goodwill. Mobilmed, Inc., had a number of nonexclusive service contracts with various customers that could be canceled upon sixty days notice. In addition, Mobilmed, Inc., was factoring its receivables and continued to do so during the relevant period of time. Mobilmed, Inc., was insolvent from the time Fantry took control until its assets were transferred.

When Fantry assumed control, the tangible assets of Mobilmed, Inc., had a value of $150,000, including a $50,000 deposit that the factoring company was holding as security. Fantry had been told that the debts of Mobil-

med, Inc., were approximately $200,000, but he later determined that they were in excess of $750,000. To keep Mobilmed, Inc., in business, Fantry immediately funded the payroll of $17,000. Mobilmed, Inc., could not obtain a line of credit, and, because its service contracts were nonexclusive, they could not be used as security.

Fantry learned that the prime customer of Mobilmed, Inc., had a strong relationship with Miller, who was the president of Mobilmed, Inc., at one time and who had left Mobilmed, Inc., prior to Fantry's acquiring the option to purchase. At the time of his departure, Mobilmed, Inc., owed Miller $60,000. The prime customer was not going to honor its contract unless Miller reassociated with Mobilmed, Inc. Fantry brought Miller back to Mobilmed, Inc., and put him in charge of operations.

Late in 1996, Fantry realized that Mobilmed, Inc., could not continue to operate without an influx of capital or a reorganization of some kind. In December, 1996, Fantry filed documents with the secretary of the state to create Mobilmed, LLC. Mobilmed, Inc., ceased operation in January, 1997, and its assets apparently were transferred. Although Mobilmed, LLC, was created to acquire the assets of Mobilmed, Inc., and to take over its business, there is no clear evidence as to the identity of the entity to which the assets of Mobilmed, Inc., were transferred or how that transfer took place. Fantry and Miller controlled and directed both Mobilmed, Inc., and Mobilmed, LLC, during the relevant time.

Over the next six months, customer contracts in the name of Mobilmed, Inc., were rewritten in the name of Mobilmed, LLC. Payments for services performed by Mobilmed, LLC, were deposited in a Mobilmed, LLC, account irrespective of whether the service contracts were in the name of Mobilmed, Inc., or Mobilmed, LLC. Moneys received by Mobilmed, LLC, for services per-

formed by Mobilmed, Inc., were forwarded to the factoring company for the benefit of the accounts of Mobilmed, Inc.[4]

The tax return of Mobilmed, LLC, valued the assets of Mobilmed, Inc., at the time of the transfer at $634,000. The court found, however, that the value of the equipment of Mobilmed, Inc., was approximately $100,000, that the value of the service contracts was minimal, and that the value of the contracts and goodwill was indeterminable on the basis of the credible evidence presented. The court concluded that, at the time of the transfer, the value of the assets of Mobilmed, Inc., exceeded $120,000, but was less than $634,000, and that $515,914 was given in consideration for those assets.

The court also found that for a number of years prior to 1996, the plaintiff sold policies of insurance to Mobilmed, Inc., and to other entities owned by Cassol. When Mobilmed, Inc., defaulted on the payment of premiums due, the plaintiff commenced the Mobilmed, Inc., action in April, 1996, seeking $58,108. The plaintiff sought to attach the securities of Mobilmed, Inc., and other corporations, including a payment due the various corporations from The Hartford Insurance Company (Hartford). As a result of the request for a prejudgment attachment, Mobilmed, Inc., agreed to assign the payment due from Hartford to the plaintiff. On December 22, 1997, a modified judgment was rendered against Mobilmed, Inc., in the amount of $26,401.70 and against Cassol in the amount of $50,305.

In the present action, the plaintiff essentially is claiming that the transfer of assets from Mobilmed, Inc., to Mobilmed, LLC, prevented it from collecting the judg-

---

[4] The corrected judgment in the Mobilmed, Inc., action states, inter alia, that "[t]aking the total net premiums due of $153,129 and crediting the total payments of $126,727.30 leaves a net judgment found of $26,401.70" as to Mobilmed, Inc.

ments rendered against Mobilmed, Inc., and Cassol in the Mobilmed, Inc., action. In considering the plaintiff's claim of fraud, the court noted that the Uniform Fraudulent Transfer Act (act), General Statutes § 52-552a et seq., sets forth four situations in which the transfer of assets or the incurring of an obligation is to be construed as a fraudulent transfer. After considering the evidence, the court concluded that the defendants did not violate General Statutes §§ 52-552e (a) (1), 52-552e (a) (2) or 52-552f (a). It concluded, however, that the defendants violated § 52-552f (b)[5] by transferring the assets of Mobilmed, Inc., because Fantry and Miller were insiders and the debt was antecedent to the transfer. The court found that Fantry and Miller were liable personally to the plaintiff on the first count of the complaint and that the plaintiff had been damaged in the amount of $26,401.70.

The plaintiff sought to collect $50,305, which it claimed was the value of Cassol's shares in Mobilmed, Inc. It also claimed that the transfer of the assets of Mobilmed, Inc., diminished the value of Cassol's shares and, therefore, caused $23,904.30 of the judgment to be uncollectible. The court determined, however, that Mobilmed, Inc., was insolvent, as defined by General Statutes § 52-552c (a), immediately prior to the transfer. The plaintiff also sought attorney's fees, which the court declined to award because no attorney's fees were proven and because the act does not provide for attorney's fees.

As to the second count, the court concluded that none of the defendants was unjustly enriched. The plaintiff failed to prove the value of the assets trans-

---

[5] General Statutes § 52-552f (b) provides: "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent."

ferred or the degree, if any, to which the defendants had been enriched. With regard to the third count, the court concluded, after applying the "cigarette rule"; see *Conaway* v. *Prestia*, 191 Conn. 484, 492–93, 464 A.2d 847 (1983), quoting *Federal Trade Commission* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972); that the defendants had not violated CUTPA. The court rendered judgment in favor of the plaintiff in the amount of $26,401.70 on the first count of the plaintiff's complaint only, and both sides appealed.

Very simply, the defendants claim that the court improperly concluded that Fantry and Miller were insiders and, thus, personally liable on the debt. The plaintiff claims in its cross appeal that the court improperly concluded that Mobilmed, LLC, was not liable and that there was no violation of CUTPA. Because the record is inadequate for our review and because the briefs and arguments of both sides are devoid of legal analysis in a manner consistent with our rules of appellate practice, we do not reach the merits of the appeals.

Our rules of appellate practice are contained in chapters 60 through 86 of the Practice Book. "Except where otherwise provided, the . . . form of cross appeals . . . shall be the same as though the cross appeal were an original appeal." Practice Book § 61-8. "It is the responsibility of the appellant to provide an adequate record for review. The appellant shall determine whether the entire trial court record is complete, correct and otherwise perfected for presentation on appeal. For purposes of this section, the term 'record' is not limited to its meaning pursuant to Section 63-4 (a) (2), but includes all trial court decisions, documents and exhibits necessary and appropriate for appellate review of any claimed impropriety." Practice Book § 61-10.

The record before this court contains a copy of the revised complaint, the defendants' answer and special

defenses, and the trial court's memorandum of decision. There is no appendix in the brief of either party. See Practice Book §§ 67-4 (d) (4) and 67-8.

Practice Book § 67-4 dictates the content and organization of an appellant's brief. The brief shall contain "[a] statement of the nature of the proceedings and of the facts of the case bearing on the issues raised. The statement of facts shall be in narrative form, shall be supported by appropriate references to the page or pages of the transcript or to the document upon which the party relies . . . ." Practice Book § 67-4 (c). The statement of facts in the defendants' brief consists of two sentences and contains no references to the documents or the transcript on which they rely. The plaintiff's statement of the facts is about one page in length and is more in the nature of a statement of allegations than a recitation of the facts. The plaintiff's brief does, however, refer to its complaint and the memorandum of decision.

"The argument [shall be] divided under appropriate headings into as many parts as there are points to be presented, with appropriate references to the statement of facts or to the page or pages of the transcript or to the relevant document. The argument on each point shall include a separate brief statement of the standard of review the appellant believes should be applied." Practice Book § 67-4 (d). Although the defendants state four issues for our consideration, their argument is organized under one heading without a statement of the standard of review applicable to the claims raised. The argument is approximately two and one-half pages in length and sets forth the claim that the trial court improperly pierced the corporate veil, a claim that was neither before the trial court nor included in the defendants' statement of the issues. In its reply brief, the plaintiff consolidated its arguments because the defendants "lumped" their arguments together. The plaintiff's

analysis is about one page in length and contains no standards of review. The plaintiff's two page argument of its cross appeal is divided by the issues, but contains no standard of review or legal analysis.

"[F]or this court judiciously and efficiently to consider claims of error raised on appeal; *Karanian* v. *Maulucci*, 185 Conn. 320, 321, 440 A.2d 959 (1981); the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . *Krondes* v. *O'Boy*, 37 Conn. App. 430, 436, 656 A.2d 692 (1995)." (Internal quotation marks omitted.) *New London Federal Savings Bank* v. *Tucciarone*, 48 Conn. App. 89, 100, 709 A.2d 14 (1998). The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. Id.; see also *Middletown Commercial Associates Ltd. Partnership* v. *Middletown*, 42 Conn. App. 426, 439 n.12, 680 A.2d 1350, cert. denied, 239 Conn. 939, 684 A.2d 711 (1996). "[A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court. . . . *Fitzgerald* v. *Fitzgerald*, 16 Conn. App. 548, 554, 547 A.2d 1387, cert. denied, 210 Conn. 802, 553 A.2d 615 (1988). *Fromer* v. *Freedom of Information Commission*, 36 Conn. App. 155, 156, 649 A.2d 540 (1994)." (Internal quotation marks omitted.) *New London Federal Savings Bank* v. *Tucciarone*, supra, 101. Where the parties cite no law and provide no analysis of their claims, we do not review such claims. Id.[6]

---

[6] The calibre of the appeals here is by no means unique, as we see a similar quality of briefs far too often. We, therefore, take this opportunity to review briefly some of the basic rules of appellate advocacy.

First, an appellate advocate should know our rules of practice and be guided by them. The issues on appeal should be stated clearly and succinctly so that the court understands the appellant's claim of judicial impropriety. Writing a compelling legal argument is a painstaking, time-consuming task. Good legal analysis is premised on knowing the controlling rules of law.

The judgment is affirmed.

In this opinion the other judges concurred.

An effective appellate advocate must apply the rules of law to the facts at hand by applying or distinguishing existing legal precedent. The goal of appellate counsel is to create a document that leads the court through the logic of the advocate's position in a persuasive manner. To write a good brief and to comply with the rules of practice, counsel must state the rules of law, provide citations to legal authority that support the claims made, and know the difference between binding and persuasive precedent, as well as primary and secondary authority. Finally, an appellate advocate must abide by the rules of ethical conduct, which are incorporated in our rules of practice.